at all. Oral argument not to exceed 15 minutes per side. Mr. Hordes for the Plaintiff Appellant. Good morning, Your Honors. On behalf of the Plaintiff, Donald Hordes, I would like to take five minutes for my primary presentation. This case involves two major legal issues. Number one, did defendants maintain a sexually hostile work environment? And number two, was the plaintiff terminated and refused rehire and retaliation for his having complained about that work environment? But as the Sixth Circuit knows, you have to look at all these issues using the totality of circumstances. And these two issues are fundamentally, contextually, they're basically the same issue. What we have here is a, my client, Henry Eisenbaum, had been a very good employee for almost 20 years of employment with the Seasons Nursing Home and Retirement Facility. And he had good evaluations as a maintenance worker and then when he was promoted to the Director of Maintenance. And one event which may at first seem trivial and silly, in the spring of 2007 was the watershed mark which suddenly put his entire career with the facility on a downward trajectory. And the defendants, in this case the Appellees... What was that event? What was this watershed event? When he complained about the trivial sexual overtures by Ms. Chasteen. This was the beginning of his downward trajectory at that point in time. Could we straighten something out here before you get too much farther? I notice in the complaint that you characterize that event as being a, creating a hostile work environment. But in fact, you just told me it was a trivial event. Now you can't make a hostile work environment claim out of a trivial event. So, was it trivial or was it so serious and pervasive that there is a hostile work environment here? Your Honor, the hostile work environment was triggered more when he complained about... Well that's retaliation, that's not a hostile work environment. It can be looked upon, there are cases that say that failure to investigate even trivial sexual harassment can create a regime where sexual harassment is tolerated. But I understand where you're going with this, Your Honor. That didn't happen. But what you just said didn't happen. I'm sorry? You said there are cases that say, you know, you can have a problem even when the harassment's trivial if you don't investigate or do something. But I'm not sure how you can say that happened here. Well, what happened here was when Ms. Chasteen... He said stop it, she stopped. He says they didn't have as good a relationship after that. Okay, fine, this happens. It doesn't sound like he should be that upset about the fact that they're not good friends. He didn't seem to want to be good friends. As my brief points out, Your Honor... Excuse me, but then he didn't report it for two years. He did report it immediately to his boss saying, Mr. Quattrone, not only did... What really worries me is that she's being hostile to me and she's complaining about me in front of others. Judge Spiegel tried to make this out to be one of the tribulations of the workplace. And I get it. There are certain cases where shunning by coworkers or being marginalized is not actionable. But in this case, she used her supervisory authority to go to Chicago and say, I can't work with this man anymore. She poisoned the well in terms of his ability to do his job. And as a result of her complaining, he suddenly received a personal improvement plan, which was literally dictated by Chicago, his main manager. By the time things really collapsed, it sounded like it was just kind of a personal thing. These two just didn't like each other. Isn't that what's going on? They really didn't like each other, but they didn't like each other, right? That's part of it, but it transcended that because she ended up using that resentment of him to badmouth him in front of other people, including corporate representatives in Chicago. But you don't contend that she had any control over the officials who instituted the improvement plan, do you? I believe that using the cat's paw theory, the people that she did not write the personal improvement plan, but she had had a session with the corporate representatives when they visited from Chicago, and she complained about him to Mr. Eisenbaum, to these corporate representatives. Does the cat's paw theory work in that direction, that a lower-level person mentions something to a higher-level person? I thought it worked in the other direction. No, it can work either way, Your Honor. A cat's paw is where a nominally neutral decision-maker makes a decision based on input from a biased supervisor. And I believe if you read the cat's paw cases, the normative cat's paw cases where a lower-level supervisor influences a higher-level supervisor to take retaliatory action. I know that there were some complaints that were investigated and some criticisms of him for things that he didn't do. And he didn't deny that he didn't do those things, but he did have explanations for them. It seems to me in reading the record that there were only two of these incidents that you allege where she made some sexually inappropriate comments to him. And I want to go back to Judge Daughtry's point. First of all, how can you say that that was so severe and pervasive if, in fact, there were only two? And with respect to the retaliation complaint, where there does appear that for many of these incidents for which he was written up or disciplined or whatever, there was actually some basis to it even though he had an assertive defense. It seems to me those things work against you. Well, if you read the Harrison case, the Harrison case which we cited liberally in our brief, you can have a lawful retaliation case when someone complains about harassment even if the harassment itself is not actionable. That case happened to be a race discrimination case. So the fact that the genesis of the original discrimination is the court may find that the original harassment was not actionable. The court can still find, and in this case we respectfully urge this court to find, that what happened in the aftermath of that was actionable. With regard to the disciplines you're talking about, in a summary judgment stage, one must assume that the plaintiff's view of the facts is correct. And on each one of these disciplines, and they came right within a month or two after Ms. Chasteen resigned in frustration over her inability to work with Mr. Eisenbaum, these disciplines, he never had disciplines before, but suddenly he got a string of three disciplines. Now, they're going to say that they were justified, and a trier of fact may indeed find that they're justified, but we are at the summary judgment stage and he was disciplined. And not only that, he was not even given an opportunity before he was disciplined to give his side of the story. Can I say something about the hostile work environment claim? So I think you agreed earlier that maybe this initially had a sexual component to it, but before long it was just personal. They just didn't like each other. And what seems strange to me is by the time the relationship's really gotten bad, it has nothing to do with gender anymore. I mean, there's just two people that don't like each other. It's just a classic workplace thing. It happens. I would respond to that, Your Honor, and I understand the question, but the record evidence, if you can strew it most leniently in our favor, they did get along until he said to her, please, Michelle, stop making these comments. After that, the real harassment took place. And if the court... I mean, nothing she's saying, nothing that's happening after that that he's complaining about has anything to do with gender. The fact that he... He's a jerk. He's on and so forth and so on. But the genesis was his rejection, just as if a boss... Not exactly a rejection, just to say don't make those comments anymore. Well, he said, I don't like these comments. They're unwelcome. If, in fact, and I submit, and my time is running out, I submit to the panel that if, in fact, this case, the judgment is affirmed, I think a message is going to be sent because he paid a price. He paid a price and he forfeited his job because he had the temerity to say to an opposite-sex harasser, albeit minimal, he says stop doing that, and as a result of that, everything bad happened thereafter. Other people seeing what's happening are going to say, I'm not going to do what Mr. Eisenbaum does. Next time I get... Let me, before you get too far into your chilling argument, let me just ask you about another part of your case. In light of Mr. Eisenbaum's failure to return to work after his FMLA leave expired, why do you assert that the Supreme Court's decision in Nassar does not foreclose his Title VII claims? Because the post-Nassar Sixth Circuit cases, brief as they are because Nassar just came out last year, still used the burden-shifting framework, and so the employer has to come up with a proffered reason why he was terminated, i.e. exhausting his family leave, and we have the right to still assert that that reason is pretextual, and one of the reasons we can show is disparate treatment, and we did show disparate treatment in our brief, and the same goes for the failure to rehire. The Nassar case is out there, but we still have a chance to show that the reasons are giving are pretextual. Thank you. Thank you. Thank you. Mr. Hawkins. Mike Hawkins, Densmore & Scholl for Senior Lifestyle, with me is Jessica Baumel, another lawyer with Densmore. Your Honor, if I can just kick this off, addressing this whole issue about all this hostile work environment. I think everybody agrees the law is there wasn't sexual harassment, but if the court would pay attention to a document, number 33-6, page ID 312, it's a memo around two months subsequent to this alleged harassment taking place. It's within the time frame of this alleged report to Mr. Quattrone complaining of the sexual harassment, although in his own deposition he just refers to it as, I told him she made some inappropriate comments, doesn't even use the wording like sexual harassment or anything else. But Michelle Chastine, who's this woman who's supposed to be resentful, have animus out to get him, destroy his career, writes a memo to Henry Eisenbaum copying Mr. Quattrone, who's the executive director, and Matt Francis, who's the corporate director of sales. Subject matter, huge kudos. Thank you, Henry, all caps, five exclamation marks. The tour you did for us today came back and I met with them for an hour, was 95% sure that they are going to take floor plan A and discuss with one more adult children. All caps, thank you, thank you, four exclamation marks. Said twice during the meeting with them how much they enjoyed your tour, Michelle. This is this woman who's supposed to have had all this resentment for him rejecting her sexual request. This is this woman who's supposed to have all this animus that puts into place for two and a half years to try to destroy his career. It was irony. I think the irony of it is she testifies, she didn't even remember him complaining. She denies even making the comment. Mr. Quattrone says vaguely, yeah, I remember some comment about his shorts or something, but I don't remember anything else. He wants to say, oh, they failed to investigate it. Well, even if it's as he testified, oh, I made a complaint to my boss. My boss asked me, well, what did you do? I asked her to stop. What'd she do? She stopped. Is there any other problem? No. So here we go into this whole scenario. And then she leaves. This is in April of 2007. She writes this very positive message in July of 2007. So let me ask you. Since the central issue in this appeal appears to be Season's motivation for terminating Mr. Eisenbaum's employment and then failing to rehire him, and we are, as Counsel Opposite says, at the summary judgment stage, why is this whole issue not a factual one for a jury to resolve since we are at the summary judgment stage where all we're to do is determine whether there is a genuine issue of material fact? Because the appellant presented no issue of material fact to the trial court. You have to have some material facts that link up with the applicable law. There's no support for sexual harassment, no support for a sexually hostile work environment under any of the case law, Morris v. Oldham County. There's no cat's paw theory whatsoever because for a cat's paw to exist, Ms. Chastine would have had to implement some discipline. The testimony from the appellant was that Ms. Chastine never disciplined him, was a co-worker, and nothing she ever said ended up being related to any discipline. So you disagree with counsel that this cat's paw thing can go either way, up and down? That is not what the case law says under Bishop Ohio Department of Rehab. It says, must be evidence of a causal nexus between the ultimate decision maker, that's this lady, human resource, that writes, oh, by the way, you haven't returned from your leave. So she's writing him a memo per policy, and two other people, document 33-6, pages 16 and 17, got exactly the same letters that the appellant received, saying you have not returned at the end of your leave, your employment is terminated. And so the ultimate decision maker must rely on the supervisors, the lower level supervisors, discriminatory animus. There's no evidence that she had any animus. In fact, I would submit based on that memo that it shows she didn't have animus, no resentment, and you can't connect no animus, no resentment, with a supervisor who ends up terminating ten months after Chastine has left the employee of Senior Lifestyle and nine months after Quattrone has left. So there's not even anybody here. And the appellant has testified in his deposition that the comment stopped immediately, transcript 41, that no other sexual nature after comments by Chastine. Also testified that there was no evidence of anybody else doing any discipline related to anything that she did. So there is no material facts that connect with the law that exists in this circuit or the Supreme Court that allows for this claim to exist. Thank you. I think we understand your point. Thank you very much. Appreciate it. I guess I can't take the rest of his time, can I? That would be unconventional. I know. I have five minutes. What is your evidence of intent when it comes to the retaliation claim? Do you have any? Of intent? Yeah. Well, basically you're talking about the action. Is it all timing? Well, the one thing that he hasn't mentioned, the other side is the public policy part. The letters that I wrote would basically compress this timing issue, the intent issue, from 2007 when the harassment took place to 2009 when I was retained by Mr. Eisenbaum. I wrote a series of three letters. This has all been briefed. But tell me, before you get into that, what's your best evidence of just straight-up intent? Well, there are two ways of proving discrimination. One is the direct evidence. You're right. There is no smoking gun. What circumstantially do you have besides timing? So I'll let you get to timing in a second, but is there anything else circumstantially? First of all, the termination. Again, we showed disparate treatment where another member of management was allowed to stay off for a long time, and he was not fired for exhausting his FMLA leave. Did that person comply with all the notice? They didn't even bother to put him on FMLA leave. He was allowed to stay off indefinitely. That's been briefed. But if he wasn't on FMLA, he's not similarly situated to your client. Well, one would argue that he's treated more favorably and that he could have unlimited leave without even being on FMLA leave. He was even treated even more generously. More to the point, the letter where he was terminated, my client, they said, you were terminated because you never got back to us as to when you might return to work, and since you didn't indicate whether you'd be coming back to work in the foreseeable future, you were terminated. My client told his supervisor at the time, before he was terminated, my client said, I just got word from my doctor the surgery was fine. I should be coming back to work within a couple of weeks, albeit after the FMLA leave expired. However, he did acknowledge that he would be returning back to work in the foreseeable future. Why didn't he communicate? I mean, it's kind of odd to me. What was the explanation for not just communicating when you were supposed to communicate with the company? He did. What your plans were? He did. Right the first time? No, no, no. That's in his affidavit and also in his deposition. He did communicate with the company. He did communicate with Mr. Rotz, his supervisor. Initially or after the time had run? No, initially, before the time ran. He said, I am looking, it's in the brief, the page sites are in the brief. He did say to them, it looks like I'm going to be coming back to work. My doctor is going to release me sometime in early December. And so when they wrote the letter saying, oh, I'm sorry, Mr. Eisenbaum, you didn't tell us you were going to be returning to work. I don't have the page number in front of me, but it's certainly, it's in my brief. But here's that letter, and the woman who is head of human resources ends up by saying, should you be interested in future employment with the organization, please refer to our website for a list of current openings. We appreciate your service to the company and certainly wish you well in the future. You can reach me and give us a number with any questions. It doesn't, I mean, you're posturing a termination failure to rehire, but it doesn't look like they had just crossed him off the list given that letter. Well, that's correct, Your Honor, and that leads to my last argument, that he did, in fact, apply. He did everything they said to him to do, and he got an acknowledgment from the intersourcing, the intermediary that processed the application. He says, thank you, Mr. Eisenbaum, for your application. We will be looking at it. Our company will be deciding who to hire. And then now the judge said, well, there's no evidence that the company ever knew he had applied, when, in fact, the very agent the company held out as the gatherer of applications knew about it, and for the lower court or opposing counsel to say there's no evidence that they knew about it, it just flies in the face of agency. Are you arguing that he should have gotten some type of preference or priority because he was a former employee? Well, one can argue. Again, it's a question of fact. Are you arguing that? I am. I'm arguing that as a question of fact. Who are you going to hire to fill this vacancy? Are you going to hire the man who was a good employee? They even admit he was a good employee, and they urged him to reapply. Or are you going to hire his underling who never had that job before? A jury is entitled to say, I'm not saying we're going to win, but a jury is entitled to say, what would a rational employer do here? I mean, is an employer going to hire a guy who's been there 20 years, who they admitted that unfortunately had to resign because of FMLA, or are they going to hire someone who doesn't have the experience and doesn't have the breadth of skill? That's a question. Your red light's been on for a little while, so thank you very much. I'm sorry. I was answering the question. Thank you very much, and I appreciate your time. Thanks to both of you for your arguments and for your legal briefs. We appreciate it. The case will be submitted.